# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## PADUCAH DIVISION

UNITED STATES

     v.                                                                    No. 5:25-cr-19-BJB

CHRISTOPHER TYLER WILSON

**\* \* \* \* \***

### OPINION REGARDING DENIAL OF MOTION TO SUPPRESS

During a telephonic hearing, the Court considered and rejected a motion (DN 31) by the Defendant, Christopher Tyler Wilson, to suppress evidence obtained during searches of his house and several packages. This opinion echoes and memorializes the reasons for that denial, as discussed during the hearing with counsel for the defense (Pat Bouldin, standing in for Chastity Beyl) and prosecution (Leigh Anne Dycus).

### THE RECORD

This case emerged from a 2025 investigation by the U.S. Postal Inspection Service into narcotics trafficking. It led to charges against Wilson for conspiracy to possess with intent to distribute and actual distribution of methamphetamine and fentanyl, as well as unlawful gun possession by a felon. Indictment (DN 10). Then Wilson filed this motion to suppress evidence collected under three successive search warrants issued by U.S. Magistrate Judge King.

Counsel agreed that Wilson's motion to suppress could be taken up on the paper record without the need for an evidentiary hearing. *See United States v. Abboud*, 438 F.3d 554, 577 (6th Cir. 2006) (evidentiary hearing unnecessary to adjudicate legal rather than factual disputes).

The record consists of the three search warrants and their supporting affidavits filed by U.S. Postal Inspector Brian Coyt as well as an investigation report prepared by ATF Special Agent T.J. Worthen. *See* DN 31-1 to -4. The first warrant authorized the search of two packages addressed to Wilson; the second the search of his house; and the third a separate package that Wilson dropped off at the post office. The second and third warrants each incorporate facts supporting the prior warrant(s) as well as findings gleaned from the resulting search(es).

Wilson contends that all three warrants lacked probable cause.

1

**Warrant 1.**  According to Inspector Coyt's affidavit, between March 6 and 7, 2025, he identified two suspicious packages ("parcels 36 and 40," as identified by the last two digits of their USPS tracking numbers) en route to Wilson at his residence, 1009 Union City Highway in Hickman, Kentucky.  First Warrant and Affidavit (DN 31-2).  On March 10, Coyt used two drug-detection dogs to sniff the packages, *id.* at 10, a step that required neither a search warrant nor probable cause, *see United States v. Robinson*, 390 F.3d 853, 870 (6th Cir. 2004) ("[O]nly reasonable suspicion, and not probable cause, is necessary in order to briefly detain a package for further investigation, such as examination by a drug-sniffing dog."); *United States v. Place*, 462 U.S. 696 (1983) (canine sniff not a search under the Fourth Amendment).  As explained in Coyt's subsequent application for a warrant to open and search the packages, neither dog alerted to either package.  Both canines were trained to detect methamphetamine and cocaine, but not opiates or benzodiazepines.  First Warrant and Affidavit at 10.

Coyt nevertheless sought a warrant to open the packages.  To support probable cause for this search, his affidavit relied in part on a different search conducted a year-and-a-half earlier.  In October 2023, authorities searched another package addressed to Wilson at that same residence.  *Id.* at 4–5.  That package had also originated in California.  It contained pills, which had been pressed to resemble Adderall—and which later tested positive for methamphetamine.  *Id.* at 8.  Coyt reported this past interception among the facts that supported his belief that the two 2025 parcels likewise contained evidence of drug trafficking.

His affidavit mentioned several other aspects of the parcels that were consistent with drug dealing.  Both had shipped from California, a known drug-source state and the state of origin for the 2023 package.  Neither sender name matched the return address, according to the Consolidated Lead Evaluation and Reporting (CLEAR) database.  Parcel 40 was mailed from a post office that does not ordinarily service its return address.  The packages were addressed person-to-person, rather than to or from a business.  And postage was paid with cryptocurrency, which (according to Coyt) is commonly used in drug transactions due to its non-traceability.  *Id.* at 4–5, 9–10.

Apart from these package-profile factors, the affidavit reported that Wilson had received 40 parcels from Florida—another source state—at his address in Hickman between May 2023 and March 2025.  Postage for 16 of those Florida packages had been paid in cryptocurrency, as had postage for 15 additional packages from other locations.  *Id.* at 11.

Further, Coyt reported that an unnamed source close to Wilson told him a story connecting Wilson with what appeared to be prescription drugs shipped illegally from Florida.  According to this confidential source, a member of the CI's family had opened

a package of pills addressed to Wilson from Florida and believed them to be "Xanax bars." *Id.* at 10–11. The source also mentioned that Wilson generated his primary source of income by selling narcotics.

The warrant application also acknowledged the negative canine alerts mentioned above. *Id.*

Magistrate Judge King approved the warrant on March 11 and Coyt executed it the same day. Inside the packages he found methamphetamine (in parcel 36) and cocaine (in parcel 40). Second Warrant and Affidavit (DN 31-3) at 3. The Postal Service then notified Wilson that his parcels were available for pickup. Motion to Suppress at 5. Inspector Coyt surveilled Wilson as he arrived at the post office, dropped off a separate package, and retrieved parcels 36 and 40. Coyt and several other officers confronted Wilson and then arrested him. Investigation Report at 2.

**Warrant 2.** After executing the first warrant, Inspector Coyt obtained and executed a second for Wilson's house at 1009 Union City Highway. *See* Investigation Report at 2 (describing March 11 search).

This warrant incorporated the same facts supporting the warrant for parcels 36 and 40, plus the additional facts gleaned from the search of those two packages. Second Warrant and Affidavit at 12–13. It authorized a search of the home, outbuildings, and cars for controlled substances, drug paraphernalia, financial records, electronic devices, firearms, and other evidence of federal drug offenses. *Id.*

The search revealed, among other things, a pistol box, ammunition, body armor, a firearm suppressor, several bags of suspected fentanyl, Xanax, Adderall, methamphetamine, and $9,700 in cash. Investigation Report at 2.

**Warrant 3.** Coyt obtained a third and final warrant three days later for "parcel 83"—the package Wilson had dropped off at the post office when he arrived to retrieve parcels 36 and 40. This warrant application reiterated Coyt's prior affidavits and incorporated the findings of both prior searches. Third Warrant and Affidavit (DN 31-4). It also cited three profile factors specific to parcel 83: the recipient's name did not match the address in CLEAR, the parcel was mailed late in the afternoon, and the sender addressed it person-to-person. *Id.* at 6. A search of parcel 83 revealed 22 grams of suspected counterfeit Xanax bars. Motion to Suppress at 6.

## PROBABLE CAUSE

To comply with the Fourth Amendment, a warrant affidavit must establish probable cause to believe "that evidence of a crime will be located on the premises of the proposed search." *United States v. Hines*, 885 F.3d 919, 923 (6th Cir. 2018) (quoting *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009)). Probable cause requires "reasonable grounds for belief, supported by less than prima facie proof but

more than mere suspicion," that evidence of a crime will be found in the place to be searched. *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). In making this determination, the officer or magistrate accounts for the totality of the circumstances. *United States v. Crawford*, 943 F.3d 297, 305 (6th Cir. 2019). And "the task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984). Courts give "great deference" to the probable cause "determination of the judge who issued the search warrant" and examine the information contained within the "four corners" of the document. *United States v. Helton*, 35 F.4th 511, 518 (6th Cir. 2022).

The totality of the circumstances outlined in Inspector Coyt's affidavit provided the magistrate judge sufficient basis to find probable cause. Inspector Coyt presented mutually reinforcing pieces of information: drug-package profile factors, including shipment from a known source state, return address irregularities, person-to-person addressing, and payment by cryptocurrency; a known informant tip—Inspector Coyt knew the source's identity, spoke with the source, and confirmed the source's report that packages were being shipped to Wilson from Florida through USPS records; a prior search of the same address that yielded methamphetamine; and since that prior search, a history of 40 packages shipped to Wilson over two years from a source state, 16 with postage paid in cryptocurrency. First Warrant and Affidavit at 4–5, 9–11. Taken together, these facts establish a fair probability that parcels 36 and 40 contained contraband. *Cf., e.g.*, *United States v. Martin*, 526 F.3d 926, 930, 937 (6th Cir. 2008) (even a "rather vague" confidential informant tip, corroborating trash pull, and defendant's criminal history mutually reinforced one another to establish probable cause).

Wilson's arguments to the contrary are unpersuasive. Their common flaw is an unduly narrow scope of the probable-cause determination.

*First,* Wilson argues that the dogs' failure to alert is the "most dispositive fact" that disproves probable cause. A positive canine alert can, and often does, support a probable-cause determination. *United States v. Whitley*, 34 F.4th 522, 536 (6th Cir. 2022) ("A dog's positive alert to narcotics can serve as probable cause to search 'if a bona fide organization has certified a dog after testing his reliability in a controlled setting.'") (citing *Florida v. Harris*, 568 U.S. 237, 246–47 (2013)). Here, the drug dog didn't alert. And on that basis Wilson denies the antecedent: the dogs' failure to alert disproves probable cause. Motion to Suppress at 6. But that is a fallacy.

That a positive alert, standing alone, can supply probable cause doesn't establish that a negative alert, regardless of context, must defeat probable cause.

What matters, as articulated most prominently in *Illinois v. Gates*, 462 U.S. 213, 238 (1983), is whether the information before the magistrate, considered as a whole, indicates a "fair probability that contraband or evidence of a crime [would] be found." Indeed, that seminal Supreme Court decision emphasized that a "totality-of-the-circumstances approach is far more consistent with" the caselaw's treatment of "probable cause than is any rigid demand that specific 'tests' be satisfied." *Id.* at 230–31. "Perhaps the central teaching of our decisions bearing on the probable-cause standard is that it is a practical, nontechnical conception," which "deal[s] with probabilities" involving "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 231 (quotation marks omitted).[1]

More recently, the Supreme Court has underscored rather than undermined this "common-sensical standard." *Florida v. Harris*, 568 U.S. 237, 244 (2013) (quotation marks omitted). As Justice Kagan explained, the Court has "consistently looked to the totality of the circumstances" and "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach."[2]

---

[1] Or, in the more mathematical terms used by Judge Randolph to describe the analysis:

> Courts and magistrate judges assessing probable cause necessarily deal with conditional probabilities. Otherwise, a judge would have to examine only one fact at time, without relating that fact to the others, and ask "Did this circumstance create probable cause?" If the answer were no, that fact would be thrown into the dustbin and the judge would pick up the next fact, look it over and ask the same question, and so on. Everyone knows that this is not the way courts (and the police) actually proceed, or should proceed. The events surrounding criminal activity are often quite unlike coin flips, where two heads in a row are irrelevant to the probability of heads on the next toss. Attention must be paid to the question whether events should be considered dependent, to whether the existence of one fact—for example, the wrapping on a package or its configuration or its bulk—makes the existence of another fact—for example, illegal drugs—more probable. This is why our opinion speaks in terms of "conditional probability'" rather than the common, but non-descriptive, "totality of the circumstances." *United States v. Prandy-Binett*, 995 F.2d 1069, 1070–72 (D.C. Cir. 1993).

*United States v. Prandy-Binett*, 5 F.3d 558, 559 (D.C. Cir. 1993) (Randolph, J., concurring in denial of rehearing en banc) (citing J.A. PAULOS, INNUMERACY: MATHEMATICAL ILLITERACY AND ITS CONSEQUENCES 63 (1988)).

[2] Justice Kagan's unanimous opinion continued:

> In *Gates,* for example, we abandoned our old test for assessing the reliability of informants' tips because it had devolved into a "complex superstructure of evidentiary and analytical rules," any one of which, if not complied with, would

True, *United States v. Davis*, 430 F.3d 345, 356 (6th Cir. 2005), held that a drug dog's failure to alert dispelled officers' suspicion that the defendant possessed narcotics. But that case involved an officer's reasonable-suspicion determination during an extended traffic stop. Although the effect of a negative alert might conceivably dispel either probable cause or reasonable suspicion when the information is scant or in equipoise, the Sixth Circuit has noted that a showing of probable cause often carries a greater quantum of information not so easily dispelled by a non-alert. "The failure of a drug dog to alert may not always dispel probable cause, but it dispels mere reasonable suspicion…." *Harris v. Klare*, 902 F.3d 630, 637 (6th Cir. 2018). *Davis* itself drew a similar distinction between precedents in which "courts determined that even without [a] dog's alert there was probable cause to justify a more extended detention, whereas in this case there was only the more limited basis of reasonable suspicion." 430 F.3d at 356. Regardless, under *either* standard the question whether a negative canine alert defeats probable cause "depends on the surrounding facts." *United States v. McElrath*, 2023 WL 8681193, at *3 (W.D. Ky. Dec. 15, 2023) (comparing *United States v. Perez*, 440 F.3d 363, 373 (6th Cir. 2006) and *United States v. Colbert*, 525 F. App'x 364, 368 (6th Cir. 213) with *Davis*, 430 F.3d at 356).

And as discussed above, the totality of the circumstances amply supported probable cause—even accounting for whatever negative inference might be ascribed to the non-alerts. That a dog trained to detect some but not all drugs failed to alert didn't overcome Coyt's knowledge that Wilson had received numerous similarly suspicious packages from source states, including at least one containing drugs, and had been identified by a CI as a drug dealer who had received still more such drugs by post. This is therefore the sort of case that *Davis* itself recognized as outside the limits of its holding; that majority opinion distinguished precedents in which a negative alert did not defeat probable cause because "even without the dog's alert there was probable cause to justify a more extended detention." 430 F.3d at 356.[3]

> derail a finding of probable cause. We lamented the development of a list of "inflexible, independent requirements applicable in every case." Probable cause, we emphasized, is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."

568 U.S. at 244 (quoting *Gates*).

[3] Judge Sutton, concurring in part and dissenting in part in *Davis*, made this point directly: A dog's failure to alert does not destroy probable cause that would otherwise exist, but "is just another element to be considered." *Id.* at 365 (quoting *United States v. Jodoin*, 672 F.2d 232, 236 (1st Cir. 1982) (Breyer, J.)). The Sixth Circuit, as the partial concurrence noted, had reached similar conclusions in unpublished decisions, which *Davis* didn't purport to disturb. *See United States v. Lartigue*, 1994 WL 151337, at *5 (6th Cir. Apr. 26, 1994)

The Sixth Circuit applied this distinction the following year, concluding that a dog's failure to alert did not foreclose continued investigation where law enforcement was "still diligently pursuing other lines of investigation." *Perez*, 440 F.3d at 373 (6th Cir. 2006).

Other circuits agree that a canine's non-alert does not, by itself, dispel probable cause.[4]  Reading these decisions and *Davis* in context makes clear that a negative canine alert is but one factor in the "totality of the circumstances" analysis. *Davis*, 430 F.3d at 354 (reasonable suspicion); *cf. id.* at 358 (probable cause); *id.* at 367 (Sutton, J., dissenting in part) (probable cause) (quoting *United States v. Guzman*, 75 F.3d 1090, 1096 (6th Cir. 1996)).  The non-alert does not *automatically* dispel probable cause that otherwise exists.

That leaves Wilson's *second* argument—that the remaining factors do not independently satisfy probable cause.  This argument fares no better.  Wilson's motion addresses several aspects of Coyt's affidavit in isolation, arguing that no single factor established probable cause.  Motion to Suppress at 6–12.  But this is not the proper standard; as noted above, "[w]hether the supporting affidavit establishes probable cause is determined by examining the 'totality of the circumstances' underlying the search." *Crawford*, 943 F.3d at 305 (citing *Hines*, 885 F.3d at 923).

So-called "package profile factors" *alone*, Wilson contends, generally establish only reasonable suspicion, not probable cause.  Motion to Suppress at 8.  But Wilson overreads these decisions, which hold only that profile factors can establish reasonable suspicion, not that they fail to establish probable cause. *See United States v. Alexander*, 540 F.3d 494, 500–01 (6th Cir. 2008) (drug-package profile factors including a fictitious return address, dense packaging, and handwritten label established reasonable suspicion to detain package); *United States v. Bey*, 2025 WL

---

("the failure of a dog to alert does not nullify the officers' suspicions"); *United States v. Vidal*, 1988 WL 24216, at *1–2 (6th Cir. Mar. 17, 1988) (negative dog alert did not destroy probable cause finding).

[4] *See, e.g.*, *United States v. Villafranco-Elizondo*, 897 F.3d 635, 644 (5th Cir. 2018) ("[W]e have previously rejected the notion that the failure of a drug dog to alert deprives officers of existing probable cause."); *United States v. Edwards*, 891 F.3d 708, 712 (8th Cir. 2018) (a drug dog's failure to alert is "relevant … but not dispositive" where other evidence of probable cause exists); *United States v. Ramirez*, 342 F.3d 1210, 1213 (10th Cir. 2013) ("We will not require investigators to cease an otherwise reasonable investigation solely because a dog fails to alert, particularly when we have refused to require that a dog sniff be conducted at all."); *United States v. Glover*, 104 F.3d 1570, 1577 (10th Cir. 1997) ("Contrary to [defendant's] assertion, drug-detection dogs have not supplanted the neutral and detached magistrate as the arbiter of probable cause.").

1203175, at *2 (6th Cir. April 25, 2025) (courier profile factors establish reasonable suspicion to pull package from mail stream).

In any event, Coyt's affidavit didn't rely on profile factors alone; he also relied on an informant tip and a similar (and successful) prior search of a drug package sent from California to Wilson at Union City Highway. *See United States v. Smith*, 574 F.2d 882, 884 (6th Cir. 1978) (profile factors "may be considered . . . along with other relevant information known to the officer in evaluating whether he had probable cause…"); *United States v. Pope*, 561 F.2d 663, 667 (6th Cir. 1977) (similar). By itself, the informant tip might not furnish probable cause. *See Crawford,* 943 F.3d at 306 (explaining that when there is "no track record of credibility to fall back on," courts "require the officer to take steps to test the informant's veracity").[5] But the tip here was supported. Inspector Coyt knew the source's identity, spoke with the source directly, and confirmed through USPS records the source's report that packages were shipped to Wilson from Florida. First Warrant and Affidavit at 10–11. And regardless, the tip was not used alone for the probable-cause determination.

As to the October 2023 search, Wilson argues that "the passage of eighteen months substantially diminishes the probative weight of that prior seizure in establishing current probable cause." Motion to Suppress at 11. Although drug-related information can go stale quickly, *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009), staleness is not measured by the calendar alone. "Evidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001). Between October 2023 and March 2025, Wilson received 40 packages from known source states. First Warrant and Affidavit at 11. Wilson argues that these packages do not support ongoing drug trafficking because the dates of the packages are not specified in the warrant and they are from Florida, not California. Motion to Suppress at 12. But postage for 16 of the 40 packages was paid in cryptocurrency and they were all sent to the same address where the 2023 package was shipped. First Warrant and Affidavit at 11. During that same period, Wilson received 31 total parcels with postage purchased using cryptocurrency. This pattern suggests an ongoing enterprise, not an isolated event. Assuming *arguendo* that no single aspect of Coyt's affidavit furnishes probable cause, the affidavit viewed in totality surely does.

---

[5] The record does not indicate whether Coyt had previously relied on this informant. Coyt's affidavit describes the source only as someone with a close relationship with Wilson, with no mention of prior cooperation with law enforcement. First Warrant and Affidavit at 10–11.

### THE GOOD-FAITH EXCEPTION

In any event, the good-faith exception would preclude suppression even if Inspector Coyt's affidavit somehow fell short. Even if probable cause is lacking, suppression is not appropriate if the "evidence [was] obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). Suppression follows only if an affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 899. That is because "the marginal or nonexistent benefits produced by suppressing evidence … cannot justify the substantial costs of exclusion." *Id.* at 922. An officer may rely on a warrant—even one later held invalid—so long as the underlying affidavit provided "some connection, regardless of how remote" and "some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched." *United States v. Reed*, 993 F.3d 441, 451 (6th Cir. 2021) (quotation marks omitted).

This affidavit was not of the "bare bones" variety on which an officer's reliance may be found unreasonable. *See Helton*, 35 F.4th at 521. As described above, the affidavit contained ample information, including Inspector Coyt's explanation and observation of package profile factors, the informant tip, and the findings of the October 2023 search. An officer could reasonably rely on such an affidavit (and the magistrate's issuance of a warrant based on that affidavit) to conclude that probable cause existed—even if later litigation called the magistrate's warrant issuance into question. So the good-faith exception would defeat Wilson's argument for suppression in any event.

Wilson responds that any reasonable officer would have recognized the affidavit's constitutional infirmities, which he describes as including the negative canine alert, the generic profile factors, the third-hand informant tip, and the 17-month-old prior search. Defendant's Reply (DN 34) at 5. But that argument merely refashions his probable-cause challenge in new garb; it identifies no purported flaw beyond those considered and rejected above. An affidavit containing multiple corroborating factors—even if each is imperfect in isolation—is not the "bare bones" showing that renders reliance unreasonable. The good-faith exception requires only that an officer's reliance on the magistrate's determination was objectively reasonable, which Inspector Coyt's plainly was.

### THE "FRUIT OF THE POISONOUS TREE" DOCTRINE

Courts also "suppress evidence that is directly or indirectly 'the tainted "fruit" of unlawful governmental conduct.'" *United States v. Waide*, 60 F.4th 327, 338 (6th Cir. 2023) (citing *Nix v. Williams*, 467 U.S. 431, 441 (1984)). Wilson alleges that the searches of his residence and parcel 83 were unlawful as "fruit of the poisonous tree" stemming from the search of parcels 36 and 40. Motion to Suppress at 13.

Specifically, he notes that Inspector Coyt's affidavit submitted in support of the second warrant describes the drug evidence recovered from parcels 36 and 40 as "the core of its probable cause showing"—what Wilson calls "the linchpin of the Residence warrant." *Id.* Similarly, Wilson notes that the "unlawful" searches of parcels 36 and 40 "set in motion the precise chain of events that produced the seizure of Parcel 83." *Id.* at 16. Thus, Wilson argues, the searches of his residence and Parcel 83 were the "direct result of the illegal searches of Parcels 36 and 40," warranting suppression of their contents. *Id.* at 16–17.

But Wilson's "fruit of the poisonous tree" argument rises and falls with his challenge to the first warrant. As discussed above, probable cause did in fact support the warrant for parcels 36 and 40. There was no poison to begin with. And to the extent the information provided in the first warrant supports the probable-cause finding, it supports the second and third warrants, too. These warrants rely on all the same statements that supported the warrant for those parcels, in addition to the contents of parcels 36 and 40. *See* Second Warrant and Affidavit; Third Warrant and Affidavit. Additionally, even if the downstream warrants were somehow tainted, the good-faith exception would apply as a backstop for the same reasons discussed above.

\* \* \* \* \*

For these reasons and those discussed during the hearing, the Court denied the suppression motion and ordered counsel to provide a joint status report within 30 days. *See* DN 37. In response to that report (DN 39), the Court directs the parties to file another status report no later than July 17, 2026. The time between this order and July 24, 2026, is excluded under the Speedy Trial Act because the ends of justice served by this continuance outweigh the interests of the public and the right of the Defendant to a speedier trial. *See* 18 U.S.C. § 3161(h).